Elaine WRIGHT, Plaintiff-Appellant,

v.

ALLSTATE CASUALTY COMPANY,
Defendant-Respondent,

Rene STERMOLE and Maria Stermole,
Defendants.

Court of Appeals

*No. 2010AP385. Submitted on briefs October 6, 2010.
—Decided February 1, 2011.*

2011 WI App 37

(Also reported in 797 N.W.2d 531.)

754

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Thomas R. Jacobson*, *Kay Nord Hunt*, and *Diane M. Odeen* of *Lommen, Abdo, Cole, King & Stageberg, P.A.*, of Hudson.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Christine M. Benson* and *Stephanie Hanold Anacker* of *Hills Legal Group, Ltd.*, of Waukesha.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. CURLEY, P.J. Elaine Wright appeals an order granting summary and declaratory judgment to All-state Insurance Company, which insured Rene Stermole—who, while mentally ill, fatally shot Wright's husband—and Rene's mother, Maria Stermole.[1] Wright presents five bases for appeal, four of which pertain to Rene and one that pertains to Maria.

¶ 2. With regard to Rene, Wright contends that the trial court erred in determining that several exclusions in Maria's Allstate homeowner's policy excluded insurance coverage for the shooting. Wright first contends that the trial court erred in applying the policy's "intentional acts" exclusion because Rene was mentally ill when he shot her husband—indeed, the jury found that he had a mental disease or defect at the time of the shooting and therefore exonerated him from any criminal penalties—*i.e.*, he argues that he was incapable of intending to cause injury or commit a criminal act. Second, Wright argues that the trial court erred in applying the policy's "mental capacity" exclusion, which excludes intentional acts, "even if such insured person lacks the mental capacity to govern his or her conduct," because this exclusion does not encompass both portions of Wisconsin's insanity test. Third, Wright argues that the trial court erred in applying the "mental capacity" exclusion because it violates public policy. Fourth, in the

---

[1] Because Maria and Rene share the same last name, to avoid confusion they will be addressed by their first names.

event that her first three arguments fail, Wright claims in the alternative that the trial court erred in granting summary judgment because genuine issues of material fact exist concerning Rene's intent on the day of the shooting.

¶ 3. As to Maria, Wright argues that the trial court erred in finding Allstate did not have to provide coverage for Maria because Maria had an expectation that the policy would cover damages that arose from the shooting. Specifically, Wright argues that because Maria was merely negligent and committed no intentional acts, the intentional acts exclusion should not have applied to her.

¶ 4. We conclude that: (a) the intentional acts exclusion, as well as the mental capacity clause, "even if such person lacks the mental capacity to govern his or her conduct," both excluded coverage because Rene intended to kill Wright's husband and he lacked the mental capacity to govern his conduct; (b) the mental capacity clause in the intentional acts exclusion is not void because it fails to track WIS. STAT. § 971.15(1) (2009–10),[2] our criminal procedure statute defining "insanity"; (c) the mental capacity clause is not against public policy; (d) there are no genuine issues of material fact; and (e) Maria could not have had a reasonable expectation of coverage for her son's murder of their next-door neighbor and she therefore has no insurance coverage because the policy exclusion applies to all insureds if the intentional act was committed by "any insured." As a result, we affirm.

_____

[2] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

## I. Background.

¶ 5. On a hot June day in 2007, Wright's husband, Mark, was in their backyard setting up a charcoal grill in order to barbeque. Rene, then fifty-six years of age, lived next door with his elderly mother. At his trial for first-degree intentional homicide, Rene testified and explained—through his delusional view of the world—what he thought had occurred.

¶ 6. According to Rene, Mark had been stalking him for some time and had made death threats against him. Rene also believed that Mark was somehow connected to the El Rukn gang. Rene was particularly fearful of El Rukn because its members had—according to Rene—tried to extort his parents' house from him at gunpoint in 1986.

¶ 7. On the day of the shooting, Rene claimed to have seen two alleged El Rukn members, the same men who had allegedly attempted to extort him at gunpoint decades earlier, on a shopping trip. Rene journeyed home shaken by this encounter. He felt exhausted and uncomfortable because, even on this very hot day, he was wearing several layers of clothing to conceal the loaded guns he always carried to protect himself from perceived danger.

¶ 8. As Rene returned to his residence, his feelings grew more intense when he saw neighbor Mark in his backyard talking on a cell phone. According to Rene, Mark's walking about the yard and talking on his phone was anything but benign; it was a confrontational "statement" communicating Mark's intent to kill him. Rene reacted, first, by secretly photographing Mark, a measure he considered necessary to prove to the FBI that Mark had been stalking him, and second, by praying for the strength to endure a violent encounter.

Rene then approached Mark, who, at this point had grilling utensils in one hand and a trash bag in another hand. Believing the grilling utensils to be weapons and the trash bag a pretext, and also believing—based on conversations that he claimed to have overheard between Mark and other gang members—that Mark was wearing a bulletproof vest, Rene shot Mark numerous times, killing him. Rene explained to the jury that what he did was self defense.

¶ 9. As noted, Rene was charged with first-degree intentional homicide. Before the trial began, three doctors examined Rene and found him to have had a delusional disorder at the time of the shooting. A jury found him guilty of first-degree intentional homicide, but also found that, at the time of the murder, pursuant to Wis. Stat. § 971.15(1), he had a mental disease or defect which resulted in his lacking substantial capacity either to appreciate the wrongfulness of his conduct or to conform that conduct to the requirements of law. As a result, Rene was committed to the Department of Health and Family Services for life.

¶ 10. Wright sued Rene, Maria and Maria's homeowners insurance company, Allstate. The complaint stated that Rene "negligently shot and killed Mark A. Wright." With respect to Maria, the complaint alleged, *inter alia,* that Maria knew that Rene was mentally unstable and that he kept guns and ammunition at her property. Consequently, she "was negligent in allowing a dangerous condition to exist on her property" and "was negligent in failing to exercise control over the conduct of Rene so as to prevent him from posing an unreasonable risk of harm to people located nearby." Represented by separate attorneys, Rene and Maria filed answers to the complaint, as did Allstate. Allstate took the position in its answer, cross-claim and counterclaim that it had

no duty to defend Rene and Maria and sought bifurcation of the coverage issue and a declaratory judgment stating it had no duty to defend. The trial court granted the bifurcation motion and stayed the underlying proceedings until the coverage issue was resolved. Ultimately, the trial court granted Allstate's motion for declaratory and summary judgment. This appeal follows.

## II. ANALYSIS.

*Standard of Review*

¶ 11. This appeal reviews the trial court's order granting Allstate's motion for declaratory judgment and summary judgment. Both declaratory judgments and summary judgments are proper procedural devices for resolving insurance disputes. *See, e.g., Commercial Union Midwest Ins. Co. v. Vorbeck*, 2004 WI App 11, ¶ 7, 269 Wis. 2d 204, 674 N.W.2d 665. We review both summary and declaratory judgments *de novo,* applying the same methodology as the trial court. *Westphal v. Farmers Ins. Exch.*, 2003 WI App 170, ¶ 9, 266 Wis. 2d 569, 669 N.W.2d 166; *see also Sentry Ins. v. Davis*, 2001 WI App 203, ¶ 2, 247 Wis. 2d 501, 634 N.W.2d 553.

¶ 12. Specifically, the resolution of this case requires interpretation of insurance policy exclusions to determine whether coverage exists. The construction and interpretation of an insurance policy is a question of law that we review *de novo. Badger Mut. Ins. Co. v. Schmitz*, 2002 WI 98, ¶ 50, 255 Wis. 2d 61, 647 N.W.2d 223. Exclusions are narrowly construed against the insurer. *Whirlpool Corp. v. Ziebert*, 197 Wis. 2d 144, 152, 539 N.W.2d 883 (1995).

*A. The trial court correctly found that the intentional acts exclusion applied to Rene's actions even though he was mentally ill at the time.*

¶ 13. Wright first contends that the exclusion in the policy should not apply to Rene because his mental illness prevented him from both "appreciat[ing] the wrongfulness of his conduct" or "conform[ing] his conduct to the requirements of law." The exclusion reads, in pertinent part:

**Losses We Do Not Cover Under Coverage X:**

1. **We** do not cover any **bodily injury** or **property damage** intended by, or which may reasonably be expected to result from the intentional or criminal acts or omissions of, any **insured person**. This exclusion applies even if:

 a) such **insured person** lacks the mental capacity to govern his or her conduct . . . .

Wright submits that Rene's conduct in shooting Mark constituted an accident because Rene was mentally ill at the time of the shooting, and consequently, he did not "intend to cause injury." Stated otherwise, Wright argues that Rene's mental illness prevented him from forming an intent to injure. Wright relies principally on a Minnesota case, *State Farm Fire & Cas. Co. v. Wicka*, 474 N.W.2d 324 (Minn. 1991), for support. In that case, the Minnesota Supreme Court determined that an insured's mental status prevents application of the intentional acts exclusion. Wright uses this construction of the intentional acts policy exclusion—that insanity prevents an intentional act from being intentional within the criminal liability statute—to contend that because Rene was found not to be criminally liable

for his actions in shooting Mark, his actions were not intentional, and thus, there was coverage under the policy. We disagree.

¶ 14. While Wright correctly articulates *Wicka*'s logic, and while cases in several states do in fact hold that insanity is a bar to applying the intentional acts exclusion,[3] we observe that this view is not universally followed. Rather, numerous other courts have held, under what has been called the narrow view, that injury caused by a mentally ill insured who is incapable of distinguishing right from wrong is still intentional where the insured understands the physical nature of the consequences of the acts and intends to cause injury. *See Prasad v. Allstate Ins. Co.*, 644 So. 2d 992, 995 (Fla. 1994).[4] For example, in *Miller v. Farm Bureau Mut. Ins. Co.*, 553 N.W.2d 371, 377 (Mich. Ct. App. 1996), the Michigan Court of Appeals held that, "when the evidence unequivocally shows that the insured

---

[3] The following cases follow the same or similar logic: *Allstate Ins. Co v. Barron*, 848 A.2d 1165, 1178–79 (Conn. 2004); *Ruvolo v. American Cas. Co.*, 189 A.2d 204, 208 (N.J. 1963); *Swift v. Fitchburg Mut. Ins. Co.*, 700 N.E.2d 288, 295 (Mass. Ct. App. 1998); *Globe Am. Cas. Co. v. Lyons*, 641 P.2d 251, 253–54 (Az. Ct. App. 1982); *Mangus v. Western Cas. & Sur. Co.*, 585 P.2d 304, 306 (Colo. App. 1978).

[4] *See also State Auto. Mut. Ins. Co. v. Gross*, 373 S.E.2d 789, 791–92 (Ga. Ct. App. 1988); *Rajspic v. Nationwide Mut. Ins. Co.*, 718 P.2d 1167, 1171–72 (Idaho 1986); *Shelter Mut. Ins. Co. v. Williams*, 804 P.2d 1374, 1382–83 (Kan. 1991); *Colonial Life & Accident Ins. Co. v. Wagner*, 380 S.W.2d 224, 226–27 (Ky. 1964); *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 435–36 (Mich. 1992); *Economy Preferred Ins. Co. v. Mass*, 497 N.W.2d 6, 10 (Neb. 1993); *Mallin v. Farmers Ins. Exch.*, 839 P.2d 105, 109 (Nev. 1992); *Johnson v. Insurance Co. of N. Am.*, 350 S.E.2d 616, 620–21 (Va. 1986); *Public Emps. Mut. Ins. Co. v. Fitzgerald*, 828 P.2d 63, 66–68 (Wash. Ct. App. 1992).

intended his or her actions, the existence of mental illness does not alter that conclusion." *Id.* It further explained, "[e]vidence that an insured suffers from mental illness, standing alone, does not create a genuine issue of material fact regarding whether the insured intended his actions or the consequences of his actions." *Id.* at 375.

██

¶ 15. We agree with the reasoning expressed by *Miller* and the numerous other cases that similarly analyze this issue, and conclude that the intentional acts exclusion in Maria's policy excludes coverage. Although Rene was not subject to criminal penalties because of his mental illness, the nature of his acts does not change. Rene intentionally shot and killed Mark. He admitted as much to the jury, and the jury found him guilty of first-degree *intentional* homicide. In this instance Rene's mental illness did not prevent him from intending his actions. Therefore, there can be no coverage.

¶ 16. In addition, the wording of the policy in *Wicka* is significantly different than the policy here. In *Wicka*, the policy language read that State Farm had no duty to defend for " 'bodily injury or property damage which is expected or intended by the insured.' " *Id.* at 326. Here, the policy exclusion states that there is no coverage for "any bodily injury or property damage intended by, or which may reasonably be expected to result from the intentional or criminal acts or omissions of the insured." Importantly, the exclusion in Maria's policy goes on to say that the intentional act exclusion applies "even if such person lacks the mental capacity to govern his or her conduct." Thus, unlike the *Wicka* policy, the policy here addressed the question of

the insured's mental capacity and excluded coverage for conduct which resulted from the effects of a mental illness.

¶ 17. As a final matter, we note that inasmuch as the issue has been resolved based on the intentional act language, we see no reason to address whether Rene's acts were criminal. *Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (if decision on one point disposes of appeal, appellate court need not decide other issues raised).

B. *The mental capacity clause found in the policy is not defective for failing to include both prongs of Wisconsin's test for insanity.*

¶ 18. Next, Wright argues that the mental capacity clause, which excludes coverage for intentional acts "even if such insured person lacks the mental capacity to govern his or her conduct," is inapplicable because it does not track the language of WIS. STAT. § 971.15(1), which defines when a defendant is relieved of the consequences of his or her actions. Section 971.15(1) provides:

> A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect the person lacked substantial capacity *either* to appreciate the wrongfulness of his or her conduct *or* conform his or her conduct to the requirements of law.

(Emphasis added.) While it is true that the policy language is different from the criminal procedure statute, Wright fails to tell us why this omission renders the exclusion inapplicable. All three doctors who examined

Rene found that he lacked the substantial capacity to appreciate the wrongfulness of his actions *and* to conform his conduct to the requirements of the law at the time of the offense. Thus, it matters little that the policy language did not contain the second prong of the criminal responsibility statute. As the jury determined, at the time of the shooting Rene lacked the substantial capacity to appreciate the wrongfulness of his conduct. This wording tracks the mental capacity clause found in the policy. Thus, the mental capacity exclusion applied as written.

## C. *The policy clause does not violate public policy.*

¶ 19. Next, Wright argues that the mental capacity clause violates public policy. Wright begins her argument by noting that Wisconsin favors providing insurance coverage under the terms of a policy when it is possible to do so. She then explores the rationale behind the intentional acts exclusion, stating that the principle of fortuitousness drives the concept of liability insurance. Wright explains that this principle stands for the proposition that insurance policies cover accidents, not intentional acts. This is so because if an insurance policy covered intentional acts, an insured could control the risk, and the cost of insurance would skyrocket. Wright then completes her argument by stating that mentally ill persons who commit harmful intentional acts and who lack the ability to appreciate the harmfulness of their acts are "not engaged in consciously controlling the insurance risk"; are unlikely to "be deterred by the terms of the insurance policy"; and should not be punished by denying them liability coverage.

¶ 20. While Wright's arguments are intriguing, she fails to account for the fact that the court's goal in construing an insurance policy is to determine and carry out the intentions of the parties. *Mau v. North Dakota Ins. Reserve Fund*, 2001 WI 134, ¶ 13, 248 Wis. 2d 1031, 637 N.W.2d 45. We interpret undefined words and phrases in an insurance policy as they would be understood by a reasonable insured, giving words and phrases their common and ordinary meaning. *Acuity v. Bagadia*, 2008 WI 62, ¶ 13, 310 Wis. 2d 197, 750 N.W.2d 817; *Folkman v. Quamme*, 2003 WI 116, ¶ 17, 264 Wis. 2d 617, 665 N.W.2d 857. Here, the wording of the policy reveals that the intent of the parties was to exclude intentional acts of an insured even if the insured lacked the mental capacity to govern his conduct. Moreover, other states have approved insurance policies that include the clause "even if such insured person lacks the mental capacity to govern his or her conduct" and found, either explicitly or implicitly, that the clause is not against public policy. *See Allstate Ins. Co. v. Davis*, 430 F. Supp. 2d 1112 (D. Haw. 2006); *Espanol v. Allstate Ins. Co.*, 601 S.E.2d 821 (Ga. Ct. App. 2004); *Kimble v. Allstate Ins. Co.*, 710 So. 2d 1146 (La. Ct. App. 1998). Thus, we are satisfied the clause does not violate public policy. One very old Wisconsin case, *Pierce v. Travelers' Life Ins. Co.*, 34 Wis. 389, 1874 WL 3330 (1874), supports our conclusion. In this case, an exclusion existed in a life insurance policy for death by suicide. In reversing the trial court, the supreme court stated:

> The condition here relieves the company from liability only where the self-destruction was intentional, or committed by a party who was conscious of the nature of the act he was committing or about to commit, and

conscious of its direct and immediate consequences, though the act may have been unaccompanied by any criminal or felonious intent or purpose.

*Id.* at 396–97.[5]

D. *There are no genuine issues of material facts re-garding Rene's intent.*

¶ 21. Wright asks us, in the event we determine that the intentional acts exclusion and the mental capacity clause apply, to find that there are genuine issues of material facts concerning Rene's intent, thus negating the grant of summary judgment. For support, Wright looks ·to *Pachucki v. Republic Ins. Co.*, 89 Wis. 2d 703, 278 N.W.2d 898 (1979), a case where the injured party suffered an eye injury during a "greening pin war" at the garden center where he worked, *id.* at 705. The exclusion in the policy read: "This policy does not apply . . . to bodily injury or property damage which is either expected or intended from the standpoint of the insured." *Id.* (capitalization and one set of quotation marks omitted). Wright seizes on a sentence in the case that reads, in part: "the intent to inflict injury is a question of fact," *see id.* at 711, and asks us to overturn the declaratory and summary judgment because Rene's intent creates a factual issue.

¶ 22. While intent may well be a question of fact, here it is a fact that has already been decided. As noted,

---

[5] Wright briefly argues that we "may conclude that the clause is ambiguous on the ground that it is susceptible to more than one interpretation." Wright has not adequately developed this argument. *See Roehl v. American Family Mut. Ins. Co.*, 222 Wis. 2d 136, 149, 585 N.W.2d 893 (Ct. App. 1998) (we will not consider inadequately developed arguments).

Rene was found guilty by a jury of first-degree intentional homicide. There is no longer any question as to whether Rene's acts were intentional. Indeed, Rene testified that he intended to shoot Mark Wright, but that he did so in self-defense. Wright is now collaterally estopped from raising the issue of Rene's intent. In *Crowall v. Heritage Mut. Ins. Co.*, 118 Wis. 2d 120, 122, 346 N.W.2d 327 (Ct. App. 1984), we held "that lack of mutuality of parties does not preclude the use of collateral estoppel when it is asserted defensively to prevent a party from relitigating an issue which has been conclusively resolved against that party in a prior case." Such is the case here. Consequently, there are no genuine material facts in dispute.

*E. Maria had no reasonable expectation of coverage and her coverage was defeated by the intentional acts of her son, Rene.*

¶ 23. Wright argues that Maria had a reasonable expectation of coverage and should be afforded coverage because the acts alleged against her consist of negligent acts, not intentional ones. Specifically, the complaint alleged that Maria "was negligent in allowing a dangerous condition to exist at her property which posed an unreasonable risk of harm to people located nearby" and "was negligent in failing to exercise control over the conduct of Rene Stermole so as to prevent him from posing an unreasonable risk of harm to people located nearby." Wright acknowledges that case law exists which would defeat Maria's coverage, but Wright contends that the cases are distinguishable. We disagree.

¶ 24. In *Taryn E.F. by Grunewald v. Joshua M.C.*, 178 Wis. 2d 719, 505 N.W.2d 418 (Ct. App. 1993), we

considered whether insurance coverage existed for the parents of a juvenile who, while babysitting, sexually assaulted a young girl. The insurance policy language excluded coverage if the damage was caused by

> "a willful, malicious, wanton or otherwise intentional act of the 'insured' or performed at an 'insured's' direction or for any outrageous conduct on the part of any 'insured' consisting of any intentional, wanton, malicious acts, or, in addition, any act that would constitute wanton disregard for the rights of others."

*Id.* at 723. After reviewing the law in other jurisdictions, this court concluded "that the term 'any insured' unambiguously precludes coverage to all persons covered by the policy if any one of them engages in excludable conduct." *Id.* at 727.

¶ 25. In 2008, our supreme court tackled another insurance coverage issue in a case where damages resulted because of the insured's sexual molestation of a minor. The facts in *J.G. v. Wangard*, 2008 WI 99, 313 Wis. 2d 329, 753 N.W.2d 475, were that Wangard pled guilty to second-degree sexual assault. *Id.*, ¶ 6. It was alleged that the acts took place at two residences owned by Wangard and his wife. *Id.*, ¶ 5. Both were sued by the minor victim and her mother. *Id.*, ¶¶ 6–8. The complaint against the wife contended that she negligently failed to prevent her husband from sexually assaulting the victim. *Id.*, ¶ 7. The couple's homeowner's insurance carriers sought a declaratory judgment that they had no duty to defend because of exclusions found in the policy. *Id.*, ¶¶ 13–14. The policies contained exclusions for damages caused by the intentional conduct " 'of any covered person.' " *Id.*, ¶ 12. Our supreme court explained that:

We agree with the analysis in *Taryn E.F.* and conclude that Great Northern and Pacific's use of the phrase "any covered person" in the policies' intentional acts exclusions, like the phrase "any insured" in the *Taryn E.F.* policy, unambiguously precludes coverage for all insureds.

*J.G. v. Wangard*, ¶ 45. Wright contends that these rulings should be limited to cases involving sexual assault. Again, we disagree.

¶ 26. First, when Maria purchased homeowner's insurance, she could not have reasonably expected coverage for damages caused by her mentally ill son's intentional homicide. Discussing the issue of coverage for sexual assaults, the *Wangard* court remarked:

> As the court of appeals noted in Hagen, "[t]he average person purchasing homeowner's insurance would cringe at the very suggestion that [the person] was paying for such coverage. And certainly [the person] would not want to share that type of risk with other homeowner's policyholders."

*Id.*, ¶ 57 (citations omitted; brackets in *Wangard*). These sentiments apply equally here. Maria would not have anticipated, nor possibly would have wanted, coverage for the intentional murder of her neighbor by her son.

¶ 27. Second, and more importantly, the policy excluded coverage for all insureds if an intentional act by any insured caused damage. The policy language states in pertinent part: "We do not cover any bodily injury . . . intended by . . . *any* insured person." Like *Taryn E.F.* and *Wangard*, here the policy language prevented Maria from having any coverage for Rene's actions. Consequently, Maria has no coverage for Rene's intentional act.

771

¶ 28. In sum, the intentional acts exclusion applies to both Rene and Maria; the mental capacity clause also prevents coverage; and the mental capacity clause is not contrary to public policy. Further, there are no genuine issues of material fact. Finally, Maria would not have expected coverage for her son's murder of their next-door neighbor.

*By the Court.*—Judgment affirmed.